# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**GAY M. STORY**

**VERSUS**

**OUR LADY OF THE LAKE PHYSICIAN GROUP**

**CIVIL ACTION**

**NO. 17-651-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 44) filed by defendant Our Lady of the Lake Physician Group. Plaintiff Gay M. Story opposes the motion. (Doc. 47). The defendant has filed a reply brief in support of its motion. (Doc. 50). Oral argument is not necessary. After careful consideration of the parties' arguments, the facts in the record, and the applicable law, and for the following reasons, the defendant's motion (Doc. 44) is granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Gay Story ("Dr. Story"), who is an African-American female, filed suit on September 18, 2017, alleging that she was discriminated against on the basis of her race, sex, and age when Our Lady of the Lake Physician Group ("OLOL") fired her. On November 15, 2017, she filed an amended complaint. (Doc. 19). OLOL moved for dismissal of Dr. Story's retaliation claim and state-law claim under La. Civil Code Article 2315. (Doc. 24). On April 20, 2018, the Court granted the motion for partial dismissal. (Doc. 29). OLOL answered the remaining claims. (Doc. 30). On August 30, OLOL moved for summary judgment on all remaining claims. (Doc. 44).

### A.     Relevant Facts

On February 22, 2015, OLOL hired Dr. Story to work in its new Endocrinology Clinic. Our Lady of the Lake Physician Group is a wholly-owned subsidary of Our Lady of the Lake Regional Medical Center in Baton Rouge, Louisiana. (Doc. 44-35 at 2).  In accordance with its standard procedure, OLOL offered Dr. Story a two-year employment agreement based on a fixed annual salary of $275,000.  (Docs 44-4 at 7–8; Doc. 44-5 at 1; Doc. 44-6).  At the conclusion of the fixed-compensation period, Dr. Story's salary would shift to a production-based model of compensation—which is the norm for all full-time physicians at OLOL. (Doc. 44-4 at 7–8; Doc. 44-5 at 1).

In October 2016, four months before the scheduled expiration of the contract and the term of fixed compensation, Dr. Story requested that the fixed-compensation term be extended for two additional years. (Doc. 44-4 at 14–17; Doc. 44-17 at 1).  Jamy Richard, VP of Finance, performed an analysis of Dr. Story's compensation in relation to her level of production over a 12-month period. (Doc. 44-5 at 1–2).  Richard concluded that OLOL was overpaying Dr. Story by $125,000 per year based on her production and that Dr. Story's Endocrinology Clinic coworkers were exceeding her level of production. (*Id.*).  Accordingly, OLOL's Senior Leadership Group voted unanimously not to extend the two-year term of fixed compensation, thus guaranteeing that Dr. Story's compensation would soon be based on her productivity. (Doc. 44-4 at 13).  At Dr. Chastain's request, Dr. Story sent an email in October 2016 with a list of concerns she felt "hindered [her] ability to get [her] production numbers up." (Doc. 47-5 at 1; *see also* Doc. 44-4 at 8–9 & Doc. 44-17 at 1).

On November 11, 2016, Richard, Dr. Curtis Chastain (President and Medical Director), and LaDonna Green (VP of Operations) met with Dr. Story to inform her of the leadership group's

decision and to give Dr. Story "an understanding of what needed to be done . . . to help her get to where she needed to be from a productivity standpoint, so she wouldn't take a cut in salary." (Doc. 44-4 at 22).  This was the sole purpose of the meeting. (*Id.* at 22–23; Doc. 44-17 at 1).

At the meeting, Dr. Chastain first informed Dr. Story that her salary request was denied. (Doc. 44-17 at 1).  He then told her that her performance was below expectations, but that the purpose of the meeting was to discuss opportunities for improvement to avoid a production-related decrease in salary beginning in February 2017. (Doc. 44-4 at 22 & 24).  Dr. Story responded by pointing to a number of barriers she believed prevented her from seeing more patients, many of which—according to OLOL—were covered in her prior email and had already been resolved by that point. (Doc. 44-4 at 25; Doc. 47-11 at 8–9; Doc. 44-20 at 1).  At this point, the accounts of the meeting diverge.

According to OLOL, Dr. Chastain committed to removing any barriers to Dr. Story's ability to see patients and sought to discuss several specific ways in which Dr. Story could increase her production. (Doc. 44-4 at 14–17).  The three action items included Dr. Story: (1) billing 32 hours of patient visits per week; (2) no longer screening referrals from other doctors; and (3) conducting inpatient consultations of endocrinology patients in the hospital (which were being provided by a third-party organization). (*Id.* at 15; Doc. 44-18 at 17–18).

According to those present at the meeting, Dr. Story opposed the idea of inpatient consultations at the hospital, and immediately became angry and aggressive. (Doc. 44-5 at 2; Doc. 44-17 at 2; Doc. 44-18 at 18–19; Doc. 44-19 at 4–6).  Dr. Story began behaving "irrationally" and stating that this would be unacceptable. (Doc. 44-4 at 26–27; Doc. 44-17 at 2; Doc. 44-18 at 18).  She stated that she did not know who Richard was and did not "like the smirk on [her] face." (Doc. 44-17 at 2).

Dr. Chastain testified that if Dr. Story simply disagreed with the ways in which to improve her performance, "she'd probably still be employed today." (Doc. 44-4 at 29). Instead, "she became very aggressive, very angry, [had] very pressured speech, taunting, questioning my integrity, questioning my colleagues' integrity, . . . and saying she'd been singled out." (*Id.* at 29–30). Dr. Chastain said that it became "terribly frightening" and the room was "not a safe environment any longer," and that Dr. Story refused to stop yelling. (*Id.* at 30). "I finally had to stand up and open the door and ask her to leave." (*Id.*). According to Dr. Chastain, the three were "afraid to leave the room" after Dr. Story walked out for fear they would "bump into her again." (*Id.* at 33). Dr. Chastain considered calling security. (Doc. 44-17 at 2).

LaDonna Green testified that she had never seen anyone in a professional setting behave the way Dr. Story did at the meeting, that she "raised her voice," became "really angry[,] and would not let anyone else around the room say anything." (Doc. 44-19 at 4). Green had "never seen anything like that in [her] life." (*Id.*). Green stated that Dr. Story continually yelled at Dr. Chastain about hospital consultations and that she was "stunned" because she had "never seen [Dr. Story] come at anyone in this manner." (*Id.* at 6). The meeting left Green "shaken" and "upset," believing that "[w]e would never be able to talk with Dr. Story about anything if she's going to behave like this." (*Id.* at 8–9). Green physically moved her chair away from Dr. Story during the meeting. (Doc. 44-20 at 1–2).

Richard testified that Dr. Story "did not like [the] idea" of seeing hospital patients and became "completely irate, very insubordinate, very unprofessional, was screaming and got very aggressive, at which point Dr. Chastain said 'we need to end this meeting.'" (Doc. 44-18 at 18). Richard was confused by Dr. Story's anger because the purpose of the meeting was "how can we help you get your numbers up? What can we do to help you?" (*Id.* at 19). She testified that after

stating three times that the meeting was over, Dr. Chastain finally stood up and opened the door. (*Id.* at 20).

Additionally, two administrative assistants sitting at a desk outside the conference room told National Labor Relations Board ("NLRB") investigators that they heard a woman yelling "loudly" and in an "angry" manner, such that the two felt they might need to call security because the situation seemed "tense, uncomfortable, and a bit frightening." (Doc. 44-26 at 2).

Dr. Story states that she agreed during the meeting to conduct hospital consultations and did not express any opposition to doing so. (Doc. 47-9 at 8). She denies that she "became loud or aggressive or threatening or inappropriate in that meeting in any way." (*Id.* at 9). She stated that that she became "animated" and "raised my voice" while Dr. Chastain "raised his voice." (*Id.* at 10). She could not think of any reason why any person outside the room would have heard her. (*Id.* at 11). She agreed that Dr. Chastain asked her several times to leave the meeting, but that she refused to do so at first because she "couldn't believe what was going on with the attacks." (*Id.* at 12).

In the affidavit supporting her complaint to the National Labor Relations Board (*see infra* Section I.B.), Dr. Story corroborated that Dr. Chastain and Green discussed with her at the meeting her practice of reviewing and denying patient referrals from other physicians. (Doc. 47-11 at 8–9). She testified that Richard informed her that her productivity was lower than her coworkers', despite the fact that they worked less frequently. (*Id.* at 9). Richard's analysis accounted for the discrepancy by extrapolation, finding that if the coworkers worked the same amount of hours as Dr. Story, their production would be higher. (*Id.*). When Dr. Story responded to this with an explanation for the disparity, Richard "rolled her eyes." (*Id.*). When she rolled her eyes a second

time, Dr. Story asked "why are you being so disrespectful?" (*Id.*). Richard did not respond. (*Id.*). Then Dr. Chastain began discussing hospital consultations. (*Id.* at 9–10).

When Dr. Story suggested that a group of doctors could establish a rotation for hospital calls, Dr. Chastain replied that it would "be up to them if they choose to be on hospital [consultations]." (Doc. 47-11 at 10). Dr. Story asked, "can you just meet with us and talk about our concerns?" to which Dr. Chastain replied, "we are not here to discuss that" and "okay, this meeting is over." (*Id.*). Dr. Chastain "got up, walked to the door and opened it, and stated 'you can leave now.'" (*Id.*). He was "visibly angry" and Dr. Story was "stunned," such that she did not "get up right away." (*Id.*). She then stated "I cannot believe this" and stood up, saying "sir, sir, what are you doing?" (*Id.*). While Dr. Chastain stood with the door open, Dr. Story stated that it did not make any sense to evaluate her based on the number of patients she sees, and asked "[d]oes it make any sense to judge you by how many meetings you attend each day?" (*Id.*).

After further back and forth, Dr. Story remarked that "this must be why physicians are leaving the medical profession because of how they are treated by the administration," and Dr. Chastain replied "maybe you should decide to leave yourself." (Doc. 47-11 at 11). Dr. Story stated, "I know this was a preplanned meeting meant to intimidate and attack me." (*Id.*).

In her declaration, Dr. Story stated that she did not "behave in any way that was aggressive, belligerent, irrational, insubordinate, unprofessional, extreme, angry, abrupt, loud, threatening, or inappropriate." (Doc. 47-5 at 1).

Richard, Green, and Dr. Chastain discussed the meeting immediately afterward, with Dr. Chastain concluding that Dr. Story's behavior left administration no choice but to fire her. (Doc. 44-4 at 34; Doc. 44-17 at 2). The following Monday, Green and Tracy Taylor, a human resources employee, met with Dr. Story and informed her that her contract was being terminated. (Doc. 44-

19 at 10–11; Doc. 44-20 at 2). OLOL terminated the agreement under the "no cause" provision, which provided 90 days' pay. (Doc. 44-19 at 11; Doc. 44-20 at 2). This is OLOL's standard operating procedure because it permits "the physician to depart without negative impact on their record or reputation and affords compensation through the notice period as outlined in the contract, thereby providing a buffer during any period of unemployment." (Doc. 44-1 at 8; *see also* Doc. 44-20 at 2 & Doc. 44-23 at 1). Despite the fact that OLOL terminated Dr. Story's employment, the human resources official who processed the Separation Notice selected "resigned/quit" because Dr. Story initially requested that she be permitted to resign. (Doc. 47-19 at 1). A subsequent notice demonstrates that Dr. Story was terminated. (*Id.* at 2).

### B. Administrative Proceedings

Following her termination, Dr. Story filed a complaint with the National Labor Relations Board ("NLRB") alleging that she was fired in retaliation for sending the October 2016 email regarding administrative issues that hindered her productivity. (Doc. 44-27). The complaint did not allege discrimination on the basis of her race, sex, or age. (*See id.*). The NLRB dismissed her complaint on June 30, 2017, concluding that OLOL had addressed her concerns when she had voiced them previously, that no witness corroborated her version of events at the November 11, 2016 meeting, and that she did not submit any evidence disputing OLOL's assertion that it fired her based solely on her conduct at the meeting. (*See* Doc. 44-29 at 1). She appealed the NLRB's decision, and the NLRB denied her appeal. (*See* Doc. 44-30).

Dr. Story also filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), but later withdrew her Charge. (*See* Doc. 44-31). She then filed suit in this court, bringing claims under Title VII (race and sex discrimination, plus retaliation), the Age Discrimination in Employment Act ("ADEA") (age discrimination), the Louisiana Employment

Discrimination Law ("LEDL") (race and sex discrimination), 42 U.S.C. § 1981 (race discrimination), and La. Civil Code art. 2315. (Doc. 19 at 1). Her retaliation and Civil Code art. 2315 claims have been dismissed. (*See* Doc. 29).

### C. Parties' Arguments

OLOL first argues that it is exempt from the LEDL as a religious and nonprofit organization, and devotes a significant portion of its brief to arguing its status as both a religious organization and a nonprofit. (Doc. 44-1 at 10–18). Dr. Story conversely argues that OLOL is neither a religious organization nor nonprofit. (Doc. 47 at 10–14).

Next, OLOL consolidates its arguments with respect to race, sex, and age discrimination (which encompasses all of Dr. Story's remaining claims), arguing that Dr. Story cannot establish a *prima facie* case of discrimination because she cannot demonstrate that OLOL treated similarly situated employees more favorably. (Doc. 44-1 at 21–23). Essentially, OLOL claims that Dr. Story cannot identify any comparators because she cannot show that any other employee engaged in identical conduct and was not terminated. OLOL points to the testimony of the five witnesses to the meeting that they had never observed similar conduct by any other employee. (*Id.* at 22–23).

OLOL devotes the rest of its brief to arguing that even if Dr. Story could establish a *prima facie* case, she cannot demonstrate that OLOL's legitimate, nondiscriminatory reason for firing her (her conduct at the meeting) is a pretext for discrimination. Specifically, OLOL asserts that in addition to the complete lack of any evidence of race, sex, or age discrimination submitted by Dr. Story, the demographics of its employees "belie any suggestion of discrimination." (Doc. 44-1 at 25). OLOL then points to Dr. Story's conduct toward coworkers and NLRB/EEOC personnel as evidence that she characteristically becomes hostile and confrontational when things "are not meeting her own expectations." (*Id.* at 26–29).

In response, Dr. Story points to white coworkers, Drs. Kilpatrick (male) and Johnson (female), who are similarly situated and who were "never required to do hospital consults," while Dr. Chastain told Dr. Story during the fateful meeting that "she would be required to do them." (Doc. 47 at 17). She claims that Dr. Kilpatrick and Dr. Johnson also screened and denied referrals, but were not penalized for doing so. (*Id.* at 17). She then claims that Dr. Johnson was described as "loud" and was permitted to "raise her voice" on various occasions. (*Id.* at 18). For her age-discrimination claim, Dr. Story identifies Sheri Ammons (a nurse practitioner) and Ivan Gamboa (a physician in endocrinology) as comparators. (*Id.* at 16).

Regarding Dr. Story's conduct at the meeting, which she acknowledges is a "difference that [OLOL] identifies between Dr. Story and the other employees," Dr. Story argues that she has "fallen prey to an insidious stereotype: that of the 'angry black woman,'" before citing to a district court opinion from the Eastern District of Michigan and one from the Northern District of Illinois. (Doc. 47 at 17–18). Dr. Story argues that the five individual witnesses' characterizations of her as "angry, irrational, aggressive, disrespectful, ugly, wildly inappropriate, and the like portray Dr. Story as sub-human and establish racial animus." (*Id.* at 20). She also claims that OLOL's reasons for terminating Dr. Story "shifted," demonstrating pretext, because one of the Separation Notices it sent to the Louisiana Workforce Commission lists "resigned/quit" as the reason for separation. (*Id.*).

In its reply, OLOL addresses Dr. Story's "bizarre" stereotyping argument and points out that one of the people at the meeting, LaDonna Green, is herself an African-American woman, and states that Dr. Story's argument "masks the established fact that OLOL would have terminated anyone who acted in this manner." (Doc. 50 at 1–2) (emphasis omitted). Plus, OLOL had

terminated two white male doctors (including one under 40 years old) for conduct-related issues during the same time period. (*Id.* at 2).

OLOL also notes that "simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." (Doc. 50 at 2) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383 (5th Cir. 2017)). Instead, the proper inquiry is whether the employer's stated reason—accurate or not—was the actual reason for its decision. (*Id.* at 3).

OLOL further contends that Dr. Story's two comparators, in addition to being different because they did not engage in conduct similar to hers at the meeting, are not similarly situated because they are part-time, and were never supposed to do hospital consultations. (Doc. 50 at 5). It claims that Dr. Story also attempted to use a nurse practitioner as a compactor, who would not be similarly situated because of the obvious differences between a physician and nurse practitioner. (*Id.* at 6).

With respect to Dr. Story's argument that Dr. Johnson was "loud" and raised her voice, there is no evidence that Dr. Johnson engaged in conduct remotely similar to Dr. Story's, and Dr. Johnson testified that she has never screamed at anyone or acted aggressively at work. (Doc. 50 at 7). OLOL points out that Dr. Story's arguments with respect to her production are irrelevant, as OLOL never told her that she would be terminated if she did not see more patients. (*Id.* at 8–9). Instead, her salary would decrease because she, as any other OLOL physician, would be moved to a production-based compensation model. (*Id.*). OLOL asserts that Dr. Story's disagreement with its characterization of her behavior at the meeting is not sufficient to show pretext. (*Id.* at 9–10).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must "go beyond the pleadings" and submit competent evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

The Fifth Circuit has further explained:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## III. DISCUSSION

### A.  Title VII and 42 U.S.C. § 1981[1]

As an initial matter, the Court notes that Dr. Story's LEDL claim should be analyzed together with her Title VII and § 1981 claims because as "the analysis applicable to . . . Title VII claims also governs" LEDL claims.[2] *Minnis v. Bd. of Supervisors of La. State Univ. and Agric. and Mech. Coll.*, 55 F. Supp. 3d 864, 884–85 (M.D. La. 2014); *see also La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 477 (5th Cir. 2002) (analyzing LEDL and Title VII claims together using Title VII analysis because the LEDL and Title VII are "substantively similar").

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees on the basis of race or sex, among other characteristics. 42 U.S.C. § 2000e–2(a)(1). When relying on circumstantial evidence of discrimination, a Title VII/§ 1981 plaintiff must first establish a *prima facie* case of employment discrimination: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) a similarly situated individual outside of her protected class was treated more favorably "under nearly identical circumstances." *Carr v. Sanderson Farms, Inc.*, 665 F. App'x 335, 337 (5th Cir. 2016) (citing *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015)).

If the plaintiff establishes a *prima facie* case, a presumption of discrimination is created, and the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection, which must be legally sufficient to justify a judgment for the defendant." *Rogers v. Pearland Ind. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (internal quotation marks

---

[1] "The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017).  The only "substantive differences between the two statutes [is] their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005).  Neither of these differences is relevant here.

[2] Accordingly, the Court assumes for the sake of argument that OLOL is not exempt from the LEDL's requirements.

omitted).  If the employer satisfies its burden, the presumption of discrimination is rebutted, and "the employee must offer some evidence that the reason proffered was a pretext for discrimination, or a motivating factor for the employment discrimination was the plaintiff's protected characteristic[s]." *Id.* (internal quotation marks omitted).

Dr. Story's case fails at the *prima facie* stage because she has not identified any similarly situated persons outside of her protected classes who were treated more favorably.  "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the preferred comparator who allegedly drew dissimilar employment decisions." *Lee v. Kansas City S. R.R. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).  Dr. Story has not identified any similarly situated employee who engaged in remotely comparable conduct yet was treated more favorably.  Even accepting Dr. Story's version of events at the meeting, which are wholly contradicted by five witnesses, she openly argued with administration, raised her voice, and displayed arguably insubordinate behavior by continually questioning and challenging their assertions and explaining that this purported "mistreatment" was why physicians leave the medical field. (*See* Doc. 47-11 at 9–10).  Moreover, she admits that she refused to leave the meeting despite being told to do so by Dr. Chastain multiple times. (*Id.* at 10).  Even if her account were true, Dr. Story has not shown that any similarly situated employee to whom she points engaged in conduct that is in any way similar, let alone close to identical.[3]  Accordingly, she cannot state a *prima facie* case of employment discrimination.

Nevertheless, even if Dr. Story could demonstrate a *prima facie* case, her claim would fail under the *McDonnell Douglas* burden-shifting analysis because she has not submitted any

---

[3] The closest Dr. Story comes to identifying a similarly situated coworker is her reference to Dr. Johnson being "loud" and raising her voice. (*See* Doc. 47 at 18).  But Dr. Story has pointed to no corroborating evidence demonstrating that Dr. Johnson acted comparably at any time, and Dr. Johnson testified that she has never acted in a manner that would subject her to discipline. (Doc. 50-3 at 4).

evidence of pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). OLOL has unquestionably identified a legitimate, nondiscriminatory reason for its decision to fire Dr. Story—her conduct at the November 11, 2016 meeting. While Dr. Story devotes a significant amount of time in her brief to disputing her conduct, as well as the underlying reasons for the meeting itself (*i.e.*, her lack of production), a Title VII plaintiff cannot simply dispute the underlying facts of an employer's decision to show pretext. *See LeMaire*, 480 F.3d at 391. At the pretext stage, the plaintiff must submit evidence "demonstrating that discrimination lay at the heart of the employer's decision." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). When demonstrating pretext, the "dispute is not whether the incident happened." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 235 (5th Cir. 2015). Rather, the correct inquiry is whether the employer's perception of the employee's conduct, "accurate or not, was the real reason for her termination." *Evans v. City of Hous.*, 246 F.3d 344, 355 (5th Cir. 2001) (internal quotation marks omitted).

Here, Dr. Story has offered no evidence that OLOL's perception of her conduct was not the real reason for her termination. The undisputed evidence in the record demonstrates that OLOL had no intention of firing Dr. Story and had offered to have the meeting to provide Dr. Story with the advice and support necessary to avoid a production-based decrease in salary. Dr. Story's argument regarding OLOL's "shifting" reasons for firing her is not supported by the record. OLOL explained why it opted to fire her without cause (which is its standard operating procedure for termination of any employee). And Dr. Story's stray reference at the end of her response brief that OLOL "advised the Louisiana Workforce Commission that Dr. Story resigned" is misleading— the human resources employee who processed the Separation Notice Dr. Story points to selected "resigned/quit" because Dr. Story herself initially requested that she be permitted to resign. (Doc.

47-19 at 1). The subsequent notice correctly represents that Dr. Story was terminated. (*Id.* at 2). Accordingly, Dr. Story has presented no evidence that OLOL's stated reason for terminating her is a pretext for discrimination, and her Title VII, § 1981, and LEDL claims cannot survive summary judgment.

### B. Age Discrimination

Dr. Story's age discrimination claim also fails. The ADEA prohibits employers from terminating or otherwise discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "When a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 141 (2000) (internal quotation marks omitted). "That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* (internal quotation marks omitted).

An ADEA *prima facie* case is similar (but not identical) to one under Title VII. A plaintiff must demonstrate that she was: (1) terminated; (2) qualified for her position; (3) a member of the protected class[4] at the time of termination; and (4) either (i) replaced by someone outside of her protected class, (ii) replaced by someone younger, or (iii) otherwise terminated because of her age. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004).

If the plaintiff can establish a *prima facie* case of age discrimination, courts apply the *McDonnell Douglas* burden-shifting analysis. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010). At the third stage of the analysis, the plaintiff "must prove that age was

---

[4] Individuals 40 years of age and older belong to the protected class under the ADEA. 29 U.S.C. § 631(a).

the 'but for' cause of the challenged adverse employment action." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 440 (5th Cir. 2012).

Even if the Court accepts that Dr. Story has demonstrated a *prima facie* case of age discrimination,[5] she has not submitted any evidence suggesting that age was even a factor in OLOL's decision to terminate her, let alone the "but for cause." *See Moss v. BMC Software, Inc.*, 610 F.3d 917, 927 (5th Cir. 2010). Accordingly, summary judgment on Dr. Story's ADEA claim should be granted.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, **IT IS ORDERED** that the Motion for Summary Judgment (Doc. 44) is **GRANTED**, and all claims asserted by Plaintiff Gay M. Story in this lawsuit are **DISMISSED WITH PREJUDICE**. The Court will issue a final judgment separately.

Signed in Baton Rouge, Louisiana, on <u>February 12, 2019</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[5] This would be a significant assumption, as Dr. Story has not submitted any evidence beyond her own speculation that she was actually replaced by someone younger (Ammons and Dr. Gamboa). Conversely, Drs. Johnson and Kilpatrick (who are 62 and 56, respectively) each testified that Dr. Story's former patients were split up amongst the remaining endocrinology physicians, which included Dr. Johnson, Dr. Kilpatrick, and Dr. Gamboa. (*See* Docs. 50-3 & 50-6).